**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| Christopher C., | ) |
|     *Plaintiff*, | ) ) ) Case No. 18 CV 50223 |
| v. | ) ) Magistrate Judge Lisa A. Jensen |
| Andrew Marshall Saul, Commissioner of Social Security, | ) ) ) |
|     *Defendant*. | ) |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Christopher C. brings this action under 42 U.S.C. § 405(g) seeking a remand of the decision denying him social security benefits. The parties have consented to the jurisdiction of the Magistrate Judge. For the reasons set forth below, the decision of the ALJ is reversed and the case is remanded.

### BACKGROUND

Plaintiff's alleged disability relates to his left ankle and chronic obstructive pulmonary disease (COPD). Plaintiff fell off a ladder and broke his left ankle and left wrist on January 30, 2014. R. 323. His left wrist fracture was surgically repaired on February 5, 2014. R. 342. Plaintiff also had open reduction internal fixation surgery on his left ankle on February 13, 2014. R. 299. Unfortunately, plaintiff experienced pain in his left foot in the following months. R. 421. On December 18, 2014, podiatrist Dr. William Bush performed several surgical procedures including ankle fusion and removal of painful hardware. R. 425. Plaintiff followed up with Dr. Bush post-surgery, R. 520–35, and began physical therapy in March of 2015. R. 524. After the

---

[1] The Court will assume the reader is familiar with the basic Social Security abbreviations and jargon.

discovery of a dehiscence, or wound opening, plaintiff elected to proceed with another surgery to close the wound dehiscence on June 9, 2015. R. 1036. Plaintiff saw podiatrist Dr. Nathan Norem for several follow-up visits after the wound dehiscence surgery from June 2015 until the wound healed in October 2015. R. 890–903.

On February 3, 2016, about eight months after the wound dehiscence surgery, Dr. Bush saw plaintiff for a post-surgery check-up. Dr. Bush noted an "altered gait pattern" and pain with palpation of the plantar fascia. Plaintiff's ankle range of motion was "within functional limits yet painful with dorsiflexion." Dr. Bush recommended that plaintiff return to work on light duty. R. 965–66.

On March 23, 2016, a functional capacity evaluation (FCE) was performed by a physical therapist. The physical therapist concluded that plaintiff demonstrated an ability to function at light physical demand level. Plaintiff could lift up to forty-five pounds and carry up to thirty pounds. He could demonstrate, among other things, constant sitting, frequent standing, frequent walking, frequent stair climbing, frequent balancing, constant stooping, occasional kneeling, constant crouching, and frequent crawling. Plaintiff noted that standing/walking longer than twenty minutes aggravated his symptoms. Tylenol, sitting with ice, and elevating his leg provided relief. R. 627–28.

Dr. Kari Chase, a podiatrist, began treating plaintiff on August 15, 2016. Her review of symptoms was positive for leg swelling, left foot/ankle pain, and gait problem. On physical examination, she noted that plaintiff's left foot and ankle were mottled, and the left foot was cool to the touch. Plaintiff had rubor with dependence of the left lower extremity. His strength was 4/5 in all muscle groups. He had pain with eversion and inversion of the left ankle joint, pain on palpation to the subtalar joint, and pain with subtalar range of motion. He had small plantar

fibromas on the plantar fascia of the left foot that were painful to palpation. R. 733. Dr. Chase diagnosed: pain left foot/ankle, plantar fascial fibromatosis of left foot, neuralgia and neuritis, and post-traumatic osteoarthritis of left foot. R. 733–34. She prescribed topical pain cream, return to physical therapy, referral to a pain center for ultrasound guided injection, new x-rays, compression stockings, and supportive shoes. R. 734. Plaintiff returned to see Dr. Chase again on October 11, 2016. Dr. Chase administered a cortisone injection in plaintiff's left ankle joint to help relieve his pain. R. 751. On November 8 and December 20, 2016, Dr. Chase again administered cortisone injections. R. 754–55, 762–63. Plaintiff was still reporting that he was having "severe pain with any type of movement or pressure to the ankle joint[,]" that cortisone injections were the only option to give him relief, but that the relief did not last. R. 762.

On February 2, 2017, Dr. Chase completed a physical medical source statement. R. 780–83. In this statement, Dr. Chase opined that with prolonged sitting plaintiff would need to elevate his leg just above hip level about 20 to 50 percent of an eight-hour workday due to edema, pain, and inflammation. Plaintiff would also need to use a cane for occasional standing/walking due to his pain. Plaintiff could walk about a half block without rest or severe pain. He can stand/walk less than two hours but can sit for at least six hours in an eight-hour workday. Plaintiff can rarely lift and carry less than ten pounds and never lift and carry above ten pounds. He can never twist, stoop/bend, crouch/squat, climb stairs, and climb ladders. Dr. Chase finally noted that plaintiff suffers from "good" and "bad" days due to "flare ups of pain." R. 783.

Regarding plaintiff's COPD, plaintiff went to the emergency room on July 5, 2015 for chest pain. R. 820. The initial EKG did not show evidence of ischemia but was tachycardic. R. 831. Plaintiff was treated with aspirin, morphine, and Ativan along with topical nitroglycerin. *Id.* Plaintiff followed up with Dr. Arthur Rone, his primary care physician, who discussed

cardiovascular risk factors and advised plaintiff to stop smoking. R. 550–51. Plaintiff visited the emergency room again on February 23, 2016 for difficulty breathing, but he reported that he felt better by the time he was seen. R. 1079.

The ALJ held an administrative hearing on February 15, 2017. Plaintiff testified that his left ankle was "very stiff, and very sore, and very painful." R. 41. He also described the pain as "very deep, dull, throbbing aching pain." R. 50. On a typical day, plaintiff sits around with his leg propped up. R. 43. From 8:00 a.m. to 5:00 p.m., he elevates his leg above his hip about six and a half hours. He also keeps his leg propped up while he sleeps. R. 50. He does "small things" for housework such as washing dishes, dusting, and cooking, but he does not do the laundry because the washing machine is downstairs and he cannot do a lot of stairs. He does some grocery shopping but takes a lot of breaks. R. 44. Plaintiff further testified that he can walk about one half to one block until he needs to sit down, stand for about ten to fifteen minutes, sit for about twenty to thirty minutes before he gets "fidgety[,]" and lift/carry about ten pounds. R. 45. He smokes a pack of cigarettes per day and uses his inhaler twice per day due to his COPD. R. 46. He has been trying to cut back on his smoking. R. 47. Plaintiff testified that his treatment for his left ankle includes cortisone injections, therapy, and stretching. R. 48. The injections help with his pain for about three or four days. He recalls getting about five injections in the last three years. Plaintiff also testified to hip pain because part of his hip was removed via a bone graft for his ankle fusion surgery. R. 49. Finally, plaintiff testified that he takes medications to treat his anxiety. R. 52.

A vocational expert (VE) also testified at the hearing. She testified that considering a hypothetical person with plaintiff's age, education, work experience, and residual functional capacity (RFC), there were jobs that exist in significant numbers in the national economy. R. 57–

58. The VE was asked by plaintiff's attorney whether the availability of sedentary jobs would change if the hypothetical person needs to elevate his leg above hip level 20 to 50 percent of an eight-hour workday. R. 58–59. The VE answered that any elevation of the leg above hip level required beyond the one-hour break and lunch would eliminate the availability of unskilled sedentary work.[2] R. 59.

    The ALJ issued her decision on April 27, 2017 denying disability benefits. The ALJ identified the following severe impairments: left ankle fracture/status post open reduction internal fixation and fusion, left ankle osteoarthritis, and COPD. R. 17. She found that plaintiff had a RFC to perform sedentary work except plaintiff can "occasionally use foot controls with the lower extremity; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs and balance; and have occasional exposure to unprotected heights dangerous heavy moving machinery, extreme heat, extreme cold, humidity, dust, odors, fumes, gases, and pulmonary irritants." R. 19. When evaluating the medical opinions, the ALJ gave "good weight" to the March 23, 2016 FCE because it was consistent with Dr. Bush's February 3, 2016 opinion. R. 23. Both opinions contained a recommendation for light work, but the ALJ limited plaintiff to sedentary exertional level to give him "the benefit of every due consideration[.]" *Id.* The ALJ found Dr. Chase's opinion less persuasive primarily because her recommendation of elevating plaintiff's leg above hip level for 20 to 50 percent of the workday is not supported by her treatment notes and her opinion on plaintiff's ability to lift/carry, twist, stoop, bend, crouch, squat, and climbing stairs and ladders is outside the scope of her podiatry specialty. She gave Dr. Chase's opinion only "minimal weight." R. 24.

---

[2] The VE stated that "typically a person gets like a ten or 15-minute break, morning, afternoon and a 30-minute lunch." R. 59. Added together, a person's breaktime, including lunch, would be about one hour.

When evaluating plaintiff's symptoms, the ALJ found that plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent" with the medical record. R. 22. The ALJ relied on the following reasons: "there is no indication that his doctors witnessed swelling or edema in the past year or so or that they recommended elevating the legs[,]" "his gait was consistently normal[,]" "his symptoms and pain were largely controlled[,]" and "smoking is wholly inconsistent with treatment for any respiratory condition." R. 22, 23. Because the ALJ found that considering plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy, the ALJ concluded that plaintiff was not disabled. R. 25–26.

## STANDARD OF REVIEW

The reviewing court reviews the ALJ's determination to see if it is supported by "substantial evidence," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Accordingly, the reviewing court takes a very limited role and cannot displace the decision by reconsidering facts or evidence or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). "The ALJ is not required to mention every piece of evidence but must provide an 'accurate and logical bridge' between the evidence and the conclusion that the claimant is not disabled, so that 'as a reviewing court, we may assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review.'" *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004)). An ALJ only needs to "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). But even when adequate record evidence

exists to support the ALJ's decision, the decision will not be affirmed if the ALJ does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build a logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 WL 5475480, at *6 (N.D. Ill. Oct. 29, 2014).

## DISCUSSION

**Treating physician rule[3]**

Plaintiff first argues that the ALJ violated the treating physician rule when she gave "minimal weight" to the opinions of treating podiatrist Dr. Kari Chase. The treating physician rule has been described as a two-step process. *See Wallace v. Colvin*, 193 F. Supp. 3d 939, 946 (N.D. Ill. 2016); *Duran v. Colvin*, No. 13CV50316, 2015 WL 4640877, at *8 (N.D. Ill. Aug. 4, 2015). First, the ALJ must determine whether to give the treating physician's opinion "controlling weight," by evaluating if the opinion is both well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). A treating physician has greater familiarity with plaintiff's conditions and circumstances, and therefore an ALJ may only discount a treating physician's opinion based on "good reasons" supported by substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *Clifford*, 227 F.3d at 870.

---

[3] The Social Security Administration modified the treating-physician rule to eliminate the "controlling weight" instruction. *See* 20 C.F.R. § 404.1520c ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from your medical sources."). However, the new regulations apply only to disability applications filed on or after March 27, 2017. *Compare* 20 C.F.R. § 404.1527 ("For claims filed (see § 404.614) before March 27, 2017, the rules in this section apply."), *with* 20 C.F.R. § 404.1520c ("For claims filed (see § 404.614) on or after March 27, 2017, the rules in this section apply."). Plaintiff's application in this case was filed in 2015. Accordingly, the ALJ was required to apply the treating physician rule when deciding plaintiff's application.

7

Here, the ALJ did not adequately analyze Step One of the treating physician rule. In support of her opinion not to give Dr. Chase's opinion controlling weight, the ALJ stated:

> Dr. Chase's notes attached to the questionnaire do not support the opinion made therein. For example, Dr. Chase opined that the claimant should elevate his legs 20-50% of the time just above hip level due to edema, pain, and inflammation. Yet, other than pain, Dr Chase's notes are devoid of any observations of edema and inflammation, which renders her opinion much less persuasive.

R. 24. This statement is at worst outright incorrect or at the very least represents impermissible doctor playing. On the August 15, 2016 initial office visit with Dr. Chase, plaintiff reported that his "left foot swells, turns red when it is down." R. 732. Dr. Chase's treatment notes appear to contain several references to signs of edema, swelling, or inflammation in plaintiff's lower extremity. For example, Dr. Chase documented leg swelling and prescribed compression stockings on August 15, 2016. R. 733, 734. Dr. Chase noted rubor with dependence on the left lower extremity on each of plaintiff's four office visits.[4] R. 733, 751, 754, 762. Additionally, Dr. Chase ordered a left foot x-ray, which indicated "mild diffuse soft tissue swelling cannot be excluded." R. 771. The above signs appear to be indications of swelling or edema. However, a medical expert is required to interpret medical signs and x-rays, and the ALJ impermissibly played doctor when she concluded that that "Dr. Chase's notes and examination are devoid of any observations of edema and inflammation." *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Because the ALJ impermissibly relied on her own medical findings to conclude that Dr. Chase's notes did not support her opinions, this case must be remanded to allow the ALJ to reevaluate her conclusions at Step One of the treating physician

---

[4] Rubor is redness and is one of the four signs of inflammation. *Rubor*, STEDMAN'S MEDICAL DICTIONARY (28th ed. 2006).

8

rule. This will likely require the assistance of a medical expert to interpret the importance of the signs referenced above.

The ALJ listed as further support for her decision to give Dr. Chase's opinion less than controlling weight her assumption that "if elevation of the leg was required, she would have likely annotated it in her notes. Yet elevation of the legs to hip level is not at all indicated in her treatment notes." R. 24. The Seventh Circuit has found such an "inconsistency" as "splitting hairs unfairly" where the treating physician's treatment notes failed to tell the plaintiff to elevate his legs, but the RFC questionnaire said he must do so. *Stage v. Colvin*, 812 F.3d 1121, 1126, 1126 n.1 (7th Cir. 2016). Courts have also repeatedly pointed out that there is a difference between a physician's notes for purposes of treatment and his/her ultimate opinion as to plaintiff's ability to work. *See Jonie G. v. Saul*, No. 18 CV 50100, 2019 WL 6716610, at *7 (N.D. Ill. Dec. 10, 2019) (citing *Sampson v. Comm'r of Soc. Sec.*, 694 F. App'x 727, 735 (11th Cir. 2017); *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 356 (3d Cir. 2008); *Orn v. Astrue*, 495 F.3d 625, 634 (9th Cir. 2007) ("The primary function of medical records is to promote communication and recordkeeping for health care personnel—not to provide evidence for disability determinations.")).

Additionally, the ALJ noted that Dr. Chase recommended that plaintiff needs a cane to engage in occasional standing/walking, but there is no indication in Dr. Chase's notes that plaintiff had "obvious difficulty or abnormality when walking[.]" R. 24. While it is true that Dr. Chase's treatment notes do not describe abnormalities when walking, she did refer plaintiff to physical therapy during the time that she was treating plaintiff. By this Court's count, plaintiff had six visits with a physical therapist during the time of Dr. Chase's treatment and before Dr. Chase's medical source statement on February 2, 2017. R. 735, 738, 740, 741, 743, 745. In each

9

of those physical therapy visits, the physical therapist noted plaintiff's difficulty walking due to pain, decreased range of motion, decreased strength, and decreased balance. R. 736, 738, 740, 742, 744, 746. The physical therapists attempted to address these problems with gait and balance training. These physical therapy notes support plaintiff's difficulty or abnormality walking, but the ALJ ignored these notes. The ALJ's failure to consider these notes amounts to cherry picking. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

Finally, the ALJ noted that Dr. Chase's opinion is inconsistent with Dr. Bush's opinion on February 3, 2016 and the March 23, 2016 FCE, which both suggest that plaintiff was capable of performing work at the light exertional level. Plaintiff argues that the FCE was "stale" because it was almost one year old when Dr. Chase authored her opinion. He further argues that his condition had worsened in the interval between the FCE and Dr. Chase's opinion. Plaintiff points to Dr. Chase's findings that his skin was mottled in the left ankle and foot and that the left foot was cool to the touch. R. 733, 751, 754, 762. Plaintiff had pain with eversion and inversion of the left ankle joint as well as pain on palpation and motion of the subtalar joint. *Id.* He also had rubor and signs of swelling. *Id.* Plaintiff required three cortisone injections to his left ankle to attempt to control his pain. R. 751, 755, 763. Plaintiff also points to physical therapy notes that revealed an antalgic gait. R. 736. This Court's own review of these notes also reveal that the physical therapists noted repeated difficulty walking due to pain, decreased range of motion, decreased strength, and decreased balance. R. 736, 738, 740, 742, 744, 746. This evidence indicates some worsening of symptoms or, at the very least, development of additional symptoms since the FCE. Courts have criticized ALJs who credit an older medical opinion over a more recent opinion by a

10

treating physician, who also had a more complete medical history of plaintiff. *See, e.g.*, *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) (criticizing the ALJ for favoring a two year older state agency opinion over the treating physician's opinion); *Fugate v. Colvin*, No. 14 C 4240, 2016 WL 1043424, at *12 (N.D. Ill. Mar. 16, 2016) (criticizing the ALJ for favoring an almost one year older state agency opinion over the opinion of the treating physician who had over 100 more pages of medical evidence); *Gillespie v. Colvin*, No. 14 C 4291, 2016 WL 757959, at *9 (N.D. Ill. Feb. 26, 2016) (criticizing the ALJ for favoring two state agency opinions, which were one year and seven months older respectively, over the opinion of the treating physician who had over 300 more pages of medical evidence). Because the ALJ ignored facts that arguably supported Dr. Chase's findings and favored an older FCE over a more recent opinion of a treating physician without explanation, the ALJ committed error at Step One of the treating physician rule.

The ALJ further erred in her Step Two analysis of the treating physician rule. If the ALJ decides not to give controlling weight to a treating physician's opinion, she must evaluate certain checklist factors in order to determine how much weight to give to the opinion. *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). Those factors include the following: examining relationship, treatment relationship (length and nature of treatment relationship and frequency of examination, along with nature and extent of the treatment relationship), supportability, consistency, specialization, and other factors. 20 C.F.R. § 404.1527(c). The ALJ did evaluate the length of treatment noting that Dr. Chase had only examined plaintiff four times over seven months. R. 24. Regarding the specialization factor, the ALJ noted that a podiatrist specializes in the ankle and foot but is not a medical doctor. *Id.* While the ALJ did concede that Dr. Chase is a "treatment provider," it is unclear to this Court whether the ALJ still discounted Dr. Chase's opinion simply

because she is a podiatrist and not a medical doctor. If so, the ALJ did not explain how the fact that Dr. Chase is not a medical doctor is relevant. The issue is not whether a podiatrist is a medical doctor but whether a podiatrist is an acceptable medical source. *See Jonie G.*, 2019 WL 6716610, at *8. Under the regulations, a licensed podiatrist is an acceptable medical source for establishing that plaintiff suffers from impairments related to her feet and ankles. 20 C.F.R. § 404.1502(a)(4). To the extent that the ALJ gave "minimal weight" to Dr. Chase's opinion because she was a podiatrist and not a medical doctor, this was error. *See Jonie G.*, 2019 WL 6716610, at *8.

The ALJ further noted that "[b]eing a podiatrist, Dr. Chase's opinion regarding the claimant's ability to lift and carry is outside the scope of her specialty as is her limitations in twisting, stooping, bending, crouching, squatting, and climbing stairs and ladders[.]"[5] R. 24. The ALJ provided no explanation for this statement. She did not explain why Dr. Chase, who specializes in the foot and ankle and who was treating plaintiff for pain and limitations in the use of his foot and ankle, was not qualified to opine on how such impairments affected his ability to lift, carry, twist, stoop, bend, crouch, squat, and climb stairs and ladders. Plaintiff argues that all these activities require the use of the lower extremities. This Court agrees that a foot or ankle impairment may impact an individual's ability to perform each of these actions. Thus, without further explanation by the ALJ, this Court is not persuaded that Dr. Chase's opinion exceeded the scope of her specialty. On remand, if the ALJ relies on this factor at Step Two, the ALJ must identify what portions of Dr. Chase's opinion exceed her expertise and explain why they exceed the scope of her expertise.

---

[5] In addition, according to the ALJ, Dr. Chase's opinion does not appear to be based on personal observation of those activities. R. 24.

The ALJ's opinion in this regard also suffers from internal inconsistency. She relies on podiatrist Dr. Bush's one-line opinion in February of 2016 that plaintiff can return to work at light duty as support for her conclusion at Step One that Dr. Chase's opinion is inconsistent with other substantial evidence in the record. Yet, she discounts Dr. Chase's opinion at Step Two because as a podiatrist such opinion is outside the scope of her specialty. If Dr. Chase's opinion on plaintiff's ability to work is outside her specialization as a podiatrist, then why isn't Dr. Bush's opinion on plaintiff's ability to work also outside his specialty? The Court cannot follow the ALJ's inconsistent reasoning here. To the extent possible, the ALJ should clarify this apparent inconsistency and build a logical bridge so that the Court can properly analyze her reasoning.

The ALJ's failure to appropriately evaluate Steps One and Two of the treating physician rule cannot be deemed harmless. Dr. Chase opined that plaintiff must elevate his leg above hip level 20 to 50 percent of the workday. The VE testified that if a hypothetical person needs to elevate his leg above hip level 20 to 50 percent of the workday, this would preclude all sedentary work. R. 58–59. Thus, the weight accorded to Dr. Chase's opinion could well be outcome determinative in this case. In light of the above, the Court finds that a remand is warranted.[6]

**Symptoms Evaluation**

Because the Court is remanding the ALJ's decision based upon the treating physician rule and because, on remand, the ALJ will likely have to reevaluate plaintiff's symptoms, the Court need not answer whether the ALJ was patently wrong in her symptoms analysis.

---

[6] In remanding this case, this Court is not suggesting that the ALJ is required to reach a particular conclusion. *See Moore*, 743 F.3d at 1124. The Court is remanding so the ALJ appropriately follows the treating physician rule regardless of the conclusion.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the Government's motion for summary judgment is denied, and the decision of the ALJ is reversed and remanded for further proceedings consistent with this opinion.

Date: March 6, 2020          By: _____
                                  Lisa A. Jensen
                                  United States Magistrate Judge